CHESTER A. REED, administrator, vs. MATTAPAN DEPOSIT
AND TRUST COMPANY.

Suffolk.    November 12, 13, 1907. — April 3, 1908.

Present : KNOWLTON, C. J., HAMMOND, LORING, BRALEY, & RUGG, JJ.

*Evidence,* Materiality, Remoteness, Opinion: experts. *Witness,* Examination. *Practice, Civil,* Conduct of trial. *Corporation. Bills and Notes. Payment. Insanity.*

In an action by an administrator against a bank for the alleged balance of a deposit made by the plaintiff's intestate, the defense set up was that the balance of the deposit had been paid to the intestate upon a check drawn by him, and the plaintiff contended that this check had been forged and that its payment had been procured through a conspiracy in which the intestate's wife, who received the proceeds, participated. The plaintiff called as a witness the widow of the intestate, who testified that after receiving the money drawn upon the check she had deposited it in another bank and some two months later had withdrawn it and had used it for the payment of rent and household expenses. The plaintiff then asked her where she had kept the money after so withdrawing it. The defendant objected to the question. The plaintiff's counsel stated that he offered the evidence as showing a knowledge or consciousness on the part of the witness of having money in her hands or control that was tainted, and argued that this was material as bearing upon the genuineness of the check by which the money was obtained. The judge excluded the question. *Held,* that the exclusion was right; that, adopting the plaintiff's theory that the money was obtained by a conspiracy in which the witness participated, the conduct of the witness two months after the illegal purpose had been accomplished was immaterial for the purpose of showing such illegal procurement.

Whether a party to an action shall be allowed to put material leading questions to a witness whom he has called, on the ground of the hostility of the witness, is, at common law, within the discretion of the presiding judge.

The provision of R. L. c. 175, § 22, providing that " a party who calls the adverse party as a witness shall be allowed to cross-examine him," does not apply to an officer of a corporation who is called as a witness in an action to which the corporation is a party, such a witness not being a party, and ample provision for the examination by interrogatories of the officers of a corporation which is a party to an action being made by R. L. c. 173, § 61.

Where it is material to show that an order in writing was written by a person not living at the time of the trial, a witness who never saw the deceased write, when qualified as an expert, may be allowed to testify that the order was written by the same person who signed certain checks of the deceased admitted to be genuine.

At common law the fact that a check when presented for payment at the bank on which it is drawn has the space for the name of the payee left blank does not authorize the bank to pay the money to the bearer unless the check was delivered to such bearer with authority to receive the money.

Where a deposit has been made in a bank by a person of sound mind, and such depositor afterwards becomes insane or mentally incapacitated and when in this condition draws a check upon his account in the bank, if the bank pays the check in the ordinary course of business *without any knowledge of the insanity or mental incapacity of the drawer,* such payment is a discharge of the indebtedness of the bank to its depositor to the amount of the check, and the money cannot be recovered back.

CONTRACT by the administrator of the estate of Thomas Keyes, late of Boston, against the Mattapan Deposit and Trust Company, a corporation, to recover a balance of $7,347.81 alleged to be due upon a deposit made with the defendant by the plaintiff's intestate.    Writ dated January 18, 1904.

The answer of the defendant contained a general denial and an allegation of payment.

In the Superior Court the case was tried before *Aiken,* C. J. It appeared that on January 25, 1897, during the lifetime of the plaintiff's intestate, a check for the balance of the account was presented to and paid by the defendant.    This check read as follows :

"South Boston, Mass., January 23rd, 1897

No. —

Mattapan Deposit and Trust Co.
    Pay To The Order Of

$$\cdots\cdots\cdots\cdots\cdots\cdots\cdots\cdots\cdots\cdots 7347 \frac{81}{100} \cdots\cdots$$

Seven Thousand Three Hundred Forty Seven and 81–100 dollars

Thomas Keyes."

The plaintiff in his opening contended that this check was a forgery; and that, pursuant to a conspiracy between Keyes's wife and others, the check was forged and presented and the payment was procured, and that the money was deposited in the name of the wife in the Bay State Trust Company.    Keyes died on February 9, 1897, being between seventy and eighty-five years of age.    The plaintiff called Mrs. Keyes as a witness, and elicited the facts that she got the money and deposited it in the Bay State Trust Company, and within two months afterwards drew it out and used it for house rent and living expenses.    The plaintiff then asked her where she put the money after so withdrawing it.    Upon the defendant's objecting to the question, the

plaintiff's counsel said, " I regard, if your honor please, the witness's conduct with reference to that money as a circumstance bearing upon the main issue in this case. If this witness has conducted herself in a circumstantial way to indicate knowledge or consciousness of having money in her hands or control that was tainted, to use a current phrase of to-day, why I think it is material as bearing upon the genuineness of the check upon which it was obtained." The Chief Justice excluded the question and the plaintiff excepted.

The plaintiff called one Tyler, the defendant's actuary, as a witness, who testified that he was an officer of the defendant, that the plaintiff had put interrogatories to him as such and that he had answered them. He testified that Keyes came with one McDevitt and was paid the check in person. The plaintiff sought to lead the witness with material questions, and·claimed the right to do so because the witness was an officer of the defendant, but the defendant objected, and the Chief Justice ruled that, as matter of law, the plaintiff had not an absolute right to lead the witness, the witness not having appeared reluctant, merely because of the official relation of the witness to the defendant, and declined to permit such leading. To this ruling the plaintiff excepted.

The plaintiff sought on similar grounds to cross-examine the witness, but the Chief Justice, on a similar objection, declined to permit cross-examination; to which ruling the plaintiff excepted.

During the course of putting in its defense, the defendant subsequently called Tyler to ask him to look at three checks which went through the defendant bank, dated July 14, August 26 and August 28, 1893, purporting to be signed by Keyes, and Tyler testified that they were signed by Keyes, that they went through the bank, that Keyes's book was balanced and the checks were returned to Keyes. The counsel for the plaintiff cross-examined the witness as to these three checks and other matters, but made no attempt to cross-examine him upon the subject of the payment of the disputed check.

The plaintiff had introduced evidence tending to show that Keyes was a physical and mental wreck on January 25, 1897; that he did not go to the bank on January 25, 1897, and obtain

payment of the check; and that the signature thereto was not genuine.

The evidence of some of the witnesses for the plaintiff, and all of the witnesses for the defendant, tended to show the following facts : That on January 25, 1897, Keyes was of sound mind; that he signed the check on January 23, 1897; that he left the house on January 25, 1897, with one McDevitt, went to the bank, presented the check, received payment, returned home, and gave the money to his wife, who deposited it in the Bay State Trust Company in her own name on January 25, 1897.

Both parties introduced checks made by Keyes, from 1891 to 1896 inclusive, without objection, as standards.  The plaintiff offered one Hingston, a handwriting expert, as a witness, who, using such checks as standards, testified that, in his opinion, the disputed check was a forgery.  On cross-examination the defendant showed him an order on the Franklin Savings Bank, dated January 22, 1897, requiring the payment to Mrs. Keyes of Keyes's entire deposit in such bank, and purporting to be signed by Keyes.  The witness declined to accept the signature to such order as a standard and expressed the opinion that it was not Keyes's signature.  While putting in its case, the defendant called one John F. Young, who testified that he saw Keyes write his name on this order on January 22, 1897.  The order was thereupon put in evidence by the defendant as a standard, without objection by the plaintiff.  The defendant called and qualified Charles French as a handwriting expert, who never had seen Keyes sign his name, and knew nothing of his signature, except from standards.  Subject to the plaintiff's exception, the Chief Justice permitted French, using the checks as standards, to testify that, in his opinion, the order on the Franklin Bank was signed by Keyes.

The plaintiff asked the Chief Justice to rule as follows:

If Thomas Keyes really signed the check in question, but without his express authority some one took it and the bank paid it to one not specially authorized by him, then the fact that there is no payee designated in the check makes the payment of the check no defense to this action.

If Thomas Keyes by reason of infirmity of age and disease

had mental faculties so impaired in strength that he was not capable of understanding fully what he was doing and in that condition signed this check and drew the money, the plaintiff is entitled to a verdict, regardless of the question of genuineness or payment.

If Thomas Keyes by reason of infirmity of age and disease had mental faculties so impaired in strength that he was not capable of understanding fully what he was doing, and in that condition signed this check, and some one else went to the bank and drew the money, the plaintiff is entitled to a verdict regardless of the question of genuineness or payment.

The Chief Justice refused to make any of these rulings and gave other instructions which included the following:

"Now it being admitted that the bank had the money of Thomas Keyes, it, the bank, can relieve itself of that liability, all liability for that money, only by proving that it paid the money out with Thomas Keyes's authority.

"The contract under which the money was in the bank gave Thomas Keyes the right to it at any time. It was his when he wanted it. When he asked for it, intelligently. And the bank to protect itself in this suit must satisfy you by a fair preponderance of the evidence that it paid the money out with Thomas Keyes's authority. Now, that brings us to the question that you have before you, the principal question, — Was the money, the $7,347.81, paid out with Thomas Keyes's authority?" The substance of the instructions upon this point is stated in the opinion. Upon the mental condition of Keyes and its effect the Chief Justice instructed the jury as follows:

"Now if Thomas Keyes had sufficient intelligence to know what he was doing in relation to the check, he was of sound mind so far as what he did in reference to the check is concerned, in this case. The test of Thomas Keyes's ability as far as it is involved in this case is, did he know what he was doing? if he did, he had sufficient capacity to act. If Thomas Keyes signed the check at his house or at the bank, either, and presented it at the bank, or was present when it was presented, and he received the money, or the money was paid in his presence, the bank is protected and your verdict is for the defendant, unless there was on Keyes's part a manifest incapacity

to appreciate what he was doing so that Tyler saw it, or ought to have seen it, — or, I will put this same proposition in another form, or endeavor to state the same thing, but in a different way. Even if Thomas Keyes was not capable of knowing what he was doing at the time of payment of the check of $7,347.81, if Tyler paid the money to him personally, the bank is not liable unless Tyler knew Keyes was incapable of understanding what he did, or unless Tyler had reasonable cause to believe that Keyes was incapable of knowing what he did. Tyler was not bound to make an investigation as to Keyes's mental capacity. Tyler had a right to assume that Keyes knew what he was doing, unless there were circumstances that put him on his guard, or ought to have put him on his guard. You will bear in mind, gentlemen of the jury, as I have already said to you, that Keyes, — that the contract of the bank made it obligatory upon the bank to pay the money to Keyes unless there was something that indicated that Keyes was not of mental capacity to receive it."

The charge concluded as follows: "If you are satisfied by a fair preponderance of the evidence that the money was paid out with the authority of Thomas Keyes, and I have told you what would be sufficient to constitute an authority, then your verdict is for the defendant; unless the bank has established that the money was paid with this authority, was paid with the authority of Keyes, your verdict is for the plaintiff."

The jury returned a verdict for the defendant; and the plaintiff alleged exceptions to the admissions and exclusions of evidence, and to the rulings and refusals to rule, mentioned above.

*E. Greenhood*, for the plaintiff.

*C. F. Choate, Jr., & H. N. Berry*, for the defendant.

BRALEY, J. The questions raised by the exceptions relate either to matters of evidence, or to the refusal to instruct the jury as the plaintiff requested. It was the plaintiff's contention, upon which in opening he rested his right to recover, that the deposit standing in the name of the intestate had been paid over in his lifetime on a check to which the signature had been forged, and consequently that the defendant must repay the amount. *McIntosh* v. *Eliot National Bank*, 123 Mass. 393. In support of the contention that the forgery had been accom-

plished, the check presented and payment procured through a conspiracy in which the intestate's wife, who received the proceeds participated, she was called as a witness by the plaintiff. If later in the trial it appeared from the evidence of the defendant's witnesses, that she received the money directly from her husband, who previously had cashed the check, it was entirely competent for the plaintiff to show, if he could, that she actually had obtained it by unlawful means. It appeared from her testimony, that after having been received the money had been deposited in another trust company, and then withdrawn some two months later, and used for the payment of rent and household expenses. The further question then put was, as to where she had kept the money while it was being spent. No doubt it is well settled in the law of evidence, as the plaintiff contends, that presumptions or inferences of fact may be drawn from the proof of other facts. But, if the charge was a conspiracy in which the witness was said to have participated, yet, upon the plaintiff's theory, the illegal purpose having been accomplished when the defendant paid over the money, it is manifest that the conduct of the witness as to its custody some two months after became immaterial, and the question even under the offer of proof was excluded rightly. *Commonwealth* v. *Meserve*, 154 Mass. 64, 70.

The refusal to permit the examination of the defendant's actuary, by putting material leading questions, if placed upon the common law ground of hostility of the witness, was discretionary. If based upon R. L. c. 175, § 22, which confers upon either party to a suit the right to call and cross-examine his adversary, the answer is, that the witness was not a party, although an officer of the defendant company. *Emerson* v. *Wark*, 185 Mass. 427, 429. By R. L. c. 173, § 61, where a corporation is the adverse party ample provision is made for the examination by written interrogatories of its officers as if they were principals, and until further legislation this method must be treated as exclusive. The plaintiff, moreover, not only previously had interrogated the witness under the statute, but later, upon his being called by the defendant, the plaintiff then was afforded an opportunity for extended cross-examination.

Upon the question of the mental capacity of the decedent and

the genuineness of his signature, the evidence was conflicting. Both parties introduced certain checks the signatures to which were admitted to be genuine, and these were used as standards of comparison by the respective handwriting experts. The order on the savings bank having been admitted as a standard, subsequently an expert called by the defendant, but who never had seen the decedent write, was permitted, subject to the exception of the plaintiff, to give his opinion based upon a comparison with the standards furnished by the checks, that the signature to the order was genuine. The argument, however, that this evidence was incompetent because an attempt to establish a standard by a witness without testimonial knowledge derived from seeing the decedent write, is inapplicable. If the decedent signed the order the day before he signed the check, this fact furnished some evidence of his ability to transact business, and that the check was issued by him. This testimony, therefore, was admissible, not as proof of a standard which could be used with the others by the jury upon the principal question, but as the opinion of a qualified expert that the signature to the order was written by the same person who had signed the checks.

No error appearing either in the exclusion or admission of evidence, there remain the exceptions to a refusal to give the rulings requested. The check would have been complete if a payee had been named. But at common law, by which the rights of the parties must be ascertained, unless issued by the maker no authority was given either to the person presenting the check, or to the defendant to complete the instrument by writing in the name of the bearer as payee, and its unauthorized payment would constitute no defense against a subsequent claim for .the amount by the depositor. *Crutchly* v. *Mann*, 5 Taunt. 529. *Ives* v. *Farmers' Bank*, 2 Allen, 236, 240. See *Boston Steel & Iron Co.* v. *Steuer*, 183 Mass. 140, 145. But while the first and third requests which embodied this distinction were denied, the plaintiff suffered no prejudice. In the instructions given, the jury were told in various forms of expression, that the liability of the defendant had not been discharged unless the money was paid out by the authority of the decedent, which was explained as meaning, that being of suffi-

cient intelligence he made and delivered the check to some one who lawfully took it to the trust company, and received the money.   *Graham* v. *Middleby*, 185 Mass. 349.

The refusal to grant the second request, although presenting a question of more difficulty, was right.   It is urgently argued, that if the intestate presented the check when insane, the plaintiff as his administrator can avoid the transaction, and recover the amount in the present action, even if the defendant cannot be restored to its original status.   *Seaver* v. *Phelps*, 11 Pick. 304. *Gibson* v. *Soper*, 6 Gray, 279.   *Chandler* v. *Simmons*, 97 Mass. 508.\   *Brigham* v. *Fayerweather*, 144 Mass. 48, 51.   *Atwell* v. *Jenkins*, 163 Mass. 362, 363.   But while great mental weakness of the individual may exist without being accompanied by an entire loss of reason, and mental incapacity in one case is not necessarily so in another, in such an inquiry the true test is, was the party whose contract it is sought to avoid in such a state of insanity at the time as to render him incapable of transacting the business.   When this fact is established the contract is voidable by the lunatic or his representatives, and it is no defense under our decisions that the other party acted fairly and without knowledge of his unsoundness or of any circumstances which ought to have put him upon inquiry.   *Sever* v. *Phelps, ubi supra.   Brigham* v. *Fayerweather, ubi supra.*   Compare *Molton* v. *Camroux*, 4 Exch. 17.   *Matthews* v. *Baxter*, L. R. 8 Ex. 132, and Lawson on Contracts, (2d ed.) § 161, n. 2, for a collection of the American cases.

But the present case does not fall within this general rule. Upon becoming a depositor the relation between the defendant and the decedent was that of banker and customer, or of debtor and creditor, and the company agreed on demand to repay to him, or to his order, the amount of the deposit.   *Heath* v. *New Bedford Safe Deposit & Trust Co.* 184 Mass. 481.   The contract had been made previously at a time when his sanity was unquestioned, and when the check was cashed he simply received his own in full measure according to its terms.   By this transaction the parties did not enter into a new contract, because the act of payment of itself did not constitute an agreement, but was only the performance of the promise whereby the defendant discharged its indebtedness.   In the absence of information as to

his incapacity, no duty devolved upon the defendant to anticipate the use, or guard against any misuse, to which the intestate might put the money lawfully due and paid to him, and, if in the ordinary course of business, without any knowledge of his lunacy, the company honestly dealt with him, there is no sound legal or moral reason why the plaintiff should be permitted to disaffirm the payment.

*Exceptions overruled.*